**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| SHAW SUBURBAN MEDIA GROUP, INC., and BILL PAGE | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | |
| CHIEF JUSTICE ROBERT R. THOMAS, | ) | No. 07-CV-03289 |
| JUSTICE CHARLES E. FREEMAN, | ) | |
| JUSTICE THOMAS R. FITZGERALD, | ) | Judge Castillo |
| JUSTICE THOMAS L. KILBRIDE, | ) | |
| JUSTICE RITA B. GARMAN, | ) | Magistrate Schenkier |
| JUSTICE LLOYD A. KARMEIER, | ) | |
| JUSTICE ANNE M. BURKE, | ) | |
| JUSTICE THOMAS E. HOFFMAN, | ) | |
| JUSTICE SHEILA M. O'BRIEN, | ) | |
| JUSTICE ROBERT CAHILL, and | ) | |
| JUDGE DONALD J. O'BRIEN, JR. | ) | |
| in their official capacities | ) ) | |
| Defendants. | ) | |

**AMENDED COMPLAINT**

Plaintiffs Shaw Suburban Media Group, Inc. and Bill Page, by their attorneys, for their complaint against defendants, Chief Justice Robert R. Thomas, Justice Charles E. Freeman, Justice Thomas R. Fitzgerald, Justice Thomas L. Kilbride, Justice Rita B. Garman, Justice Lloyd A. Karmeier, Justice Anne M. Burke, Justice Thomas E. Hoffman, Justice Sheila M. O'Brien, Justice Robert Cahill, and Judge Donald J. O'Brien, Jr., allege as follows:

**PRELIMINARY STATEMENT**

1.      The constitutional cancer that infects Chief Justice Robert Thomas's defamation lawsuit against The Kane County Chronicle and its editorial page columnist Bill Page grew as the predictable result of a decision by Illinois' top judge to pursue a claim for money damages

against a small community newspaper in the friendly confines of the state legal system he dominates. Defendants in the state defamation suit are the plaintiffs in this federal civil rights action. They have recently noticed a timely appeal of the multi-million dollar windfall – the largest compensatory award in a defamation case in Illinois history – that the Chief Justice extracted from a newspaper over opinion columns that repeated pervasive speculation in Kane County about the politics of a high-profile disciplinary case before the Illinois Supreme Court. Because the Illinois judiciary cannot hear this appeal in a manner that complies with due process, equal protection, and First Amendment requirements for independent appellate review in public-official defamation cases, the Chronicle and Page seek relief in federal court.

2. When judges file lawsuits, especially defamation lawsuits, they owe the judiciary a duty to avoid creating an impression that they are taking advantage of the system for personal gain. Unless they conduct themselves with scrupulous attention to professionalism, public confidence in the legitimacy of the courts is corrosively eroded. The Illinois Code of Judicial Conduct states that "[t]he judicial duties of a judge take precedence over all the judge's other activities," Ill. Sup. Ct. R. 63 (emphasis added), and that the fundamental duties of every judge include preserving the "independence" and "integrity" of the judiciary. Ill. Sup. Ct. R. 61. Yet for the last three years, Chief Justice Thomas's suit against the 14,000-subscriber Chronicle, in which he requested $17.4 million in damages despite his inability to show any harm from the columns, has compromised the independence and the integrity of the Illinois judicial system from top to bottom.

3. Within weeks of the filing of Chief Justice Thomas's complaint in January 2004, the procedural "shimmy-shammy" that has come to define the case was already well underway. It seems self-evident that a plaintiff and his material witnesses do not have the privilege of

2

picking which judges will preside over the plaintiff's case. But the Illinois Supreme Court, with no recusal of Thomas noted, on three occasions has reassigned this matter – first to a specific Circuit Court Judge in Cook County in April 2004 and then twice to a district of the Illinois Appellate Court of its own choosing. "Audi Alterum Partem" ("Hear The Other Side") is the Illinois Supreme Court's motto, but each time the Court took the reassignment of the Chief Justice's personal lawsuit into its own hands, the Chronicle received neither notice nor an opportunity to be heard. The Supreme Court carried out the most recent of these reassignments in May 2007. This latest intervention came after the Court had stated that it was finally disqualifying itself from the state proceedings because recusals deprived it of a quorum to act and after members of the Court had testified as witnesses at the October 2006 trial.

4.     The Justices of the Illinois Supreme Court have thus played a dual role in the Chief Justice's case: partisan participants on the one hand, impartial adjudicators on the other. Due process prohibits such a manifest conflict of interest. Because Illinois has no explicit mechanism to replace disqualified judges on a temporary basis on its highest court, the state defamation case had, from the very beginning, no Supreme Court. With no Supreme Court, the three reassignment orders the Court entered were unlawful. The impropriety of the orders cannot be excused on the fiction that they were entered for the benefit of the Chronicle. They were entered for the benefit of the Chief Justice alone. The orders were issued on the request of judges in the district in which Thomas sued who were uncomfortable hearing his case. Removing the matter from these judges and reassigning it to the First District solved a problem for the Chief Justice and gave him a distinct advantage – it relieved him (and the Illinois judiciary) of defending the fairness of his prosecution of a libel claim before judges in his home district and at the same time placed his case in the district with the greatest concentration of judicial power in the state.

3

5.     The Chief Justice's defamation suit has made the <u>Chronicle</u> and Page into <u>sui</u> <u>generis</u> creatures in American libel law.  They are the only defamation defendants to be denied discovery and cross-examination rights by a "judicial deliberation privilege" – a privilege created specifically <u>in</u> this case <u>by</u> the Chief Justice's judicial subordinates <u>for</u> the six Supreme Court Justices who testified for Thomas at trial.  The <u>Chronicle</u> and Page are also the only known litigants in Illinois history to have no court of last resort in the state because the self-interest of the Supreme Court Justices resulted in their inevitable mass disqualification during interlocutory appeal – as would surely happen again were the defamation judgment to come before them. What courts can no longer achieve through the contempt power, <u>see</u> <u>Patterson v. Colorado</u>, 205 U.S. 454 (1907), Chief Justice Thomas and the Illinois Supreme Court have accomplished through the law of defamation and the creation of a judicial deliberation privilege – the punishment of a court critic.

6.     Just as "[p]eople in an open society" find it difficult to "accept what they are prohibited from observing," <u>Richmond Newspapers, Inc. v. Virginia</u>, 448 U.S. 555, 572 (1980), people in a society committed to the impartial rule of law cannot accept the legitimacy of a proceeding in which a plaintiff wins a $4 million judgment in a court system he controls.  "A fair trial in a fair tribunal is a basic requirement of due process," the Illinois Supreme Court wrote just a decade ago.  <u>People v. Hawkins</u>, 181 Ill. 2d 41, 50 (1998).  In the Court's own formulation, fairness means not just the absence of actual bias but the absence of the "probability of bias."  <u>Id.</u> This fundamental guarantee of due process and equal protection of the laws is entirely missing in the state court litigation against the <u>Chronicle</u>, ironically because of Chief Justice Thomas's lawsuit attacking opinion columns that questioned his impartiality.

7.     Similarly, the Illinois court system cannot afford the <u>Chronicle</u> and Page the federal constitutional right under the First Amendment and <u>Bose Corp. v. Consumers Union of U.S., Inc.</u>, 466 U.S. 485 (1984) to a searching, independent, <u>de novo</u> appellate review of the defamation verdict.  One cannot doubt the obvious unfairness inherent in asking the inferior judicial officers appointed to this appeal to sit in judgment over a $4 million award to their Chief Justice and to evaluate the testimony of both the Chief Justice and his fellow Supreme Court Justices – their judicial bosses – with the critical and exacting eye <u>Bose</u> demands.

8.     The Chief Justice had a choice:  his personal, financial interests or the constitutional interests of the Illinois citizens he would sue.  He chose his own interests and cornered the <u>Chronicle</u> in a forum where his power and authority have made and will make a neutral hearing of the issues impossible.  The improvised, <u>ad hoc</u> procedures permeating this case have only added to the appearance of impropriety and the intimidating atmosphere for the <u>Chronicle</u> and Page.  It is no wonder that the newspaper's sources were afraid to testify about the rampant speculation in Kane County concerning the role of politics in the Illinois judiciary.

9.     The <u>Chronicle</u> and Page now face the denial of their due process, equal protection, and First Amendment rights in the appeal of the Chief Justice's judgment.  When they earlier raised the constitutional deprivations and handicaps they would suffer in the Illinois court system, the Circuit Court Judge presiding over the defamation trial responded that those concerns would have to be saved for "another day."  That day has come.  The <u>Chronicle</u> and Page file this federal civil rights suit seeking declaratory relief and, if necessary, injunctive relief against the Chief Justice and other Illinois judicial officials in order to prevent certain future harm to their constitutional rights.

JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1343(a)(3)

and (4), 2201, and 2202 because plaintiffs assert claims under 42 U.S.C. §§ 1983 and 1988.

11.     Venue is proper in the Northern District of Illinois under 28 U.S.C. § 1391(b)

because at least one of the defendants resides in the Northern District, and because a substantial

part of the events giving rise to these claims occurred in the Northern District.

PARTIES

12.     Plaintiff Shaw Suburban Media Group, Inc. is an Illinois corporation with its

principal office located at 7717 South Route 31, Crystal Lake, Illinois 60014.  Shaw owns and

operates the Chronicle, a daily morning newspaper in Geneva, Illinois that has been serving

Kane County since 1881, as well as over 20 additional newspapers and journals in Illinois.

13.     Plaintiff Bill Page is an Illinois resident who at all times relevant to this lawsuit

lived at 1431 Walnut Hill Avenue, St. Charles, Illinois, 60174.  From September 2001 to July

2006, Page was an opinion columnist for the Chronicle writing about a broad range of local

political issues on a weekly or twice-weekly basis.  Page has worked in the media as a columnist

and advertising entrepreneur for more than three decades.

14.     Defendant Robert R. Thomas is the Chief Justice of the Illinois Supreme Court.

He was elected in 2000 to represent the Second Appellate District.  He is sued in his official

capacity.

15.     Defendant Charles E. Freeman is a Justice of the Illinois Supreme Court.  He was

elected in 1990 to represent the First Appellate District.  He is sued in his official capacity.

16.     Defendant Thomas R. Fitzgerald is a Justice of the Illinois Supreme Court.  He

was elected in 2000 to represent the First Appellate District.  He is sued in his official capacity.

6

17.     Defendant Thomas L. Kilbride is a Justice of the Illinois Supreme Court.  He was elected in 2000 to represent the Third Appellate District.  He is sued in his official capacity.

18.     Defendant Rita B. Garman is a Justice of the Illinois Supreme Court.  She was appointed in 2001 and elected in 2002 to represent the Fourth Appellate District.  She is sued in her official capacity.

19.     Defendant Lloyd A. Karmeier is a Justice of the Illinois Supreme Court.  He was elected in 2004 to represent the Fifth Appellate District.  He is sued in his official capacity.

20.     Defendant Anne M. Burke is a Justice of the Illinois Supreme Court.  On the nomination of former Justice Mary Ann G. McMorrow, the Illinois Supreme Court appointed her in 2006 to represent the First Appellate District, filling the vacancy created when Justice McMorrow retired.  She is sued in her official capacity.

21.     Defendant Thomas E. Hoffman is a Justice sitting in the Second Division of the First District of the Illinois Appellate Court.  He was elected to his current position in 1994.  He is sued in his official capacity.  Pursuant to judicial assignment orders of the Illinois Supreme Court, Justice Hoffman sat by designation in the Second Appellate District to hear the interlocutory appeal in Chief Justice Thomas's lawsuit and has been appointed to the appeal of Chief Justice Thomas's defamation judgment.

22.     Defendant Sheila M. O'Brien is a Justice sitting in the Fifth Division of the First District of the Illinois Appellate Court.  She was elected to her current position in 1994.  She is sued in her official capacity.  Pursuant to judicial assignment orders of the Illinois Supreme Court, Justice O'Brien sat by designation in the Second Appellate District to hear the interlocutory appeal in Chief Justice Thomas's lawsuit and has been appointed to the appeal of Chief Justice Thomas's defamation judgment.

7

23.     Defendant Robert Cahill is a Justice sitting in the First Division of the First District of the Illinois Appellate Court.  He was elected to his current position in 1992.  He is sued in his official capacity.  Pursuant to judicial assignment orders of the Illinois Supreme Court, Justice Cahill sat by designation in the Second Appellate District to hear the interlocutory appeal in Chief Justice Thomas's lawsuit and has been appointed to the appeal of Chief Justice Thomas's defamation judgment.

24.     Defendant Donald J. O'Brien, Jr. is a Circuit Court Judge for Cook County.  He was elected in 1990.  He is sued in his official capacity.  The Illinois Supreme Court assigned Judge O'Brien to preside by designation over the trial of Chief Justice Thomas's lawsuit.

## BACKGROUND OF THE LITIGATION

A.     Chief Justice Thomas Possesses Vast Patronage Privileges And Administrative Power Over The Illinois Court System And Has A History Of Exercising This Power.

25.     The Supreme Court is the highest judicial tribunal in Illinois, and the Illinois Constitution grants the Supreme Court general administrative and supervisory authority over all courts in the state, exercised primarily by the Chief Justice.  See Ill. Sup. Ct. R. 30(a).

26.     Chief Justice Thomas has been an elected judge in Illinois for almost 20 years.  He was chosen by his Supreme Court colleagues to serve as Chief Justice in May 2005 and was formally elevated to that position in September 2005.  His term as Chief Justice expires in 2008.  He has been sitting as the Supreme Court Justice for the Second Appellate District of Illinois since December 2000.  His term on the Illinois Supreme Court expires in 2010.  Until his election to the Supreme Court in 2000, the Chief Justice served on the Second District of the Appellate Court of Illinois, to which he won office in 1994.  From 1988 to 1994, he was a trial judge on the Circuit Court for the 18th Judicial Circuit (DuPage County), a position to which he was also elected.

27.     As the top judicial officer in Illinois, Chief Justice Thomas has "general administrative and supervisory authority over all courts" in the state.  ILL. CONST. Art. VI, § 16 (emphasis added).  This authority includes supervision over the court system and its personnel, including every judge in the state; over the Illinois Attorney Registration and Disciplinary Commission ("ARDC"), which regulates every attorney in the state; over court administrative matters, including the preparation of the Supreme Court's agenda for each of its five annual terms; and over fiscal and budget matters for the entire state judiciary.  In addition, the Chief Justice supervises all appointments to Supreme Court committees and presides over the Judicial Conference and chairs its Executive Committee.  The Judicial Conference makes recommendations for the improvement of the state courts.

28.     Judicial positions in Illinois are filled in one of three ways – by popular election, by assignment, or by appointment.  A vacancy occurring in the Supreme, Appellate, or Circuit Court is filled by the Supreme Court by appointment.  When temporary assignments to particular courts arise, the Supreme Court fills those seats as well.  For both appointments and assignments, nominations are made by the Justice of the Supreme Court from the judicial circuit or the appellate district where the opening occurs, and that nomination is voted on by the Supreme Court.  By tradition, the Supreme Court ratifies the nominations made by its individual members. The Justices of the Illinois Supreme Court thus hold enormous patronage power in state judicial ranks through their appointment and assignment authority.

29.     In his role as the Supreme Court Justice for the Second Appellate District, Chief Justice Thomas has not shied away from using judicial patronage to reward his supporters and punish at least one adversary.  Thomas nominated Mary Schostok, whose husband's law firm donated tens of thousands of dollars to Thomas's Supreme Court campaign, to a Circuit Court

9

judgeship on the 19th Circuit bench just weeks after he was sworn in to the Supreme Court.

Thomas twice nominated Robert Spence, a long-time friend, generous donor, and campaign

volunteer, to a seat on the Kane County bench, even though the Illinois State Bar Association

rated Spence "not recommended."  Thomas also nominated his campaign supporter Michael

Chmiel for a seat on the 19th Circuit bench.

30.     At least one Thomas rival has not fared as well as have the Thomas supporters.

Sixteenth Circuit Judge Michael Colwell ran against Thomas in a 1994 judicial primary for the

Appellate Court and lost.  Shortly after Thomas reached the Supreme Court in 2000, he

telephoned Colwell, who was then a trial court judge sitting on the Second District Appellate

Court by assignment, and told Colwell that he would have to surrender his assigned seat.  He

informed Colwell that he had 24 hours to make the following career-impacting Hobson's Choice:

1) Colwell could take a <u>demotion</u> back to the trial court (to a position lower in rank than the one

he held when he was assigned to the appellate court) or 2) he could accept an appointment to a

<u>different</u> appellate seat, in which case Colwell would soon be forced to suffer the expense of

running in a district-wide election and assume the risk, if he lost that election, of having no

judicial position at all.

31.     As Colwell testified in the state defamation case about having Thomas abruptly

strip him of his assigned seat so he could assign another judge to the position:  "As a practical

matter, we are all elected – the elected judges are involved in politics, and I'm sure there were

political considerations [in Thomas's actions], just because that's the way the system works."  <u>See</u>

Ex. 1 at TR 2919:1-5.[1]  Colwell was blunt about Thomas's clout within the state:  "[I]t's obvious.

He's the Chief Justice of the Supreme Court.  He has a great deal of power."  <u>Id.</u> at 2921:11-12.

---

[1]        All citations to the trial record in the state defamation case ("TR") are in Ex. 1.

32.    Indeed, as head of the Illinois judiciary, Chief Justice Thomas has direct

supervisory responsibility over all the appellate judges specially assigned to his personal

defamation case – First Appellate District Justices O'Brien, Cahill, and Hoffman – as well as

over Circuit Court Judge O'Brien, who presided over the trial.  The Supreme Court Justices from

the First Appellate District also supervise Justices O'Brien, Cahill, and Hoffman and Circuit

Court Judge O'Brien.  Thus, Supreme Court Justices Freeman, Fitzgerald, and Burke have (and

Justice McMorrow had) direct authority over the Appellate Court judges presiding over their

colleague's defamation action.  Justices Freeman, Fitzgerald, and McMorrow all testified on

behalf of Chief Justice Thomas at trial and all opposed discovery propounded by the <u>Chronicle</u>

and Page throughout the state litigation.

B.    <u>A Controversial Disciplinary Proceeding Arrives At The Illinois Supreme Court</u>.

33.    In 2003, the Illinois Supreme Court heard a widely-publicized attorney

disciplinary proceeding brought by the ARDC against Kane County State's Attorney Mary

Elizabeth Gorecki.  The ARDC charges filed against Gorecki were the first ever against a sitting

state's attorney in Illinois.  Unlike the vast majority of ARDC cases, when the Gorecki matter

reached the Illinois Supreme Court, the Court took the step of ordering additional briefing and

hearing oral argument.

34.    In February 2001, shortly after Gorecki was sworn into office, the ARDC filed a

complaint alleging that she had violated the Illinois Rules of Professional Conduct.  The ARDC

asserted that Gorecki, a Republican and the first female state's attorney elected in Kane County,

acted improperly in 1998 when she left telephone messages for a friend stating that she could

help arrange a county job in exchange for campaign contributions to a political ally.  The

answering machine tapes were turned over to the sheriff's department and made public more

than a year later – and just three weeks before the March 2000 Republican primary.

35.     The allegations that Gorecki had committed ethical violations made news both within and outside Kane County.  See, e.g., Dan Rozek, State to probe prosecutor; Gorecki hit by ethics inquiry, CHI. SUN-TIMES, February 24, 2001, at 4; Alicia Fabbre, Gorecki's troubles deepen, DAILY HERALD, February 24, 2001, at 1.

36.     The ARDC Hearing Board found that Gorecki had engaged in misconduct and recommended a six-month suspension of her law license.  She appealed, and the ARDC Review Board affirmed the findings but recommended a two-month suspension.  In February 2003, the Administrator of the ARDC appealed to the Illinois Supreme Court.  The Supreme Court allowed the petition in May 2003 and docketed the case for further proceedings.  In November 2003, the Supreme Court affirmed the findings but increased Gorecki's suspension to four months.  See In Re Gorecki, 208 Ill. 2d 350 (2003).

37.     Kane County is located within the Second Appellate District.  As an elected judicial official from the Second Appellate District since 1988, Thomas would naturally be more than ordinarily interested in a high-profile and politically-charged appeal coming to the Supreme Court from Kane County.

38.     The Chronicle published three opinion columns speculating on the politics, motivations, influences, and circumstances surrounding the Gorecki appeal, including the possible judicial jockeying over the case and Thomas's role in the Supreme Court's decision-making.  The columns appeared on May 15, 2003 ("Gorecki is Victim of Powerful Politics"), May 20, 2003 ("Gorecki Deliberations Tainted by Politics"), and November 25, 2003 ("Of Course It's Political").  All three columns appeared on the newspaper's editorial/opinion page under a prominent 60-point banner headline labeling the page "Opinion."

12

39.     In the first opinion column, published after the beginning of the May 2003 term of the Illinois Supreme Court, Page theorized that party politics were at work in the Gorecki case because Gorecki, though herself a Republican, had angered the GOP establishment by running against her former boss and the sitting Republican state's attorney, David Akemann, in the 2000 primary.  Page wrote that Thomas was "pushing hard for very severe sanctions – including disbarment.  Other justices do not agree, with at least two opting for simple censure, but Thomas' pressure could result in a 'compromise' – a year's suspension of Gorecki's law license."  Page predicted that at the very least the Illinois Supreme Court would not follow the two-month suspension handed down by the ARDC Review Board – which turned out to be true.  See Ex. 2.

40.     In the second opinion column, Page acknowledged the "harrumphing denials" coming from the Illinois Supreme Court over his May 15 column.  He continued to speculate about the politics on the bench, however, because "literally everyone" to whom he spoke in Kane County was "blunt in their assessment" that the Gorecki case was political to the core and that Thomas was "not impartial when it came to Gorecki."  Page argued that Thomas should recuse himself from the proceeding because he was "perceived by party regulars as being politically motivated to punish Gorecki . . . [and] [t]he perception is so strong that any participation by Thomas in the final decision will taint it and make it suspect."  See Ex. 3.

41.     In the third opinion column, published after the Illinois Supreme Court issued its decision in the Gorecki case, Page again expressed his opinion that Thomas's "objectivity" in the case was "highly suspect" because his political base back in his district supported the incumbent Akemann in the 2000 primary.  Page wrote that the compromise of a four-month suspension was "in effect, the result of a little political shimmy-shammy.  In return for some high profile Gorecki supporters endorsing Bob Spence, a judicial candidate favored by Thomas, he agreed to the four-

month suspension." <u>See</u> Ex. 4.

42.     In his deposition in the defamation action, Chief Justice Thomas would acknowledge that he was a strong Spence supporter.  Before the columns were published, Thomas had twice appointed Spence to the 16th Judicial Circuit, once in 2000 and again in 2002 after Spence was defeated in a circuit-wide election for a position on the court.  The 2002 appointment created political fallout in Kane County for both.  <u>See</u> <u>Spence appointment hurts public faith</u>, DAILY HERALD, May 6, 2002, at 8.  Spence would run again for the 16th Judicial Circuit in 2004 – after the <u>Chronicle</u> columns appeared – and this time he would win a seat (with help from Gorecki's backers).  For the past several years, the Illinois Supreme Court has appointed him to serve on the exclusive 15-member Executive Committee of the state's Judicial Conference.

C.      Page's Understanding Of The Gorecki Case Reflected Wide-Spread Speculation In Kane County As Well As His Own Knowledge Of Thomas's Past Political Maneuvering.

43.     Page wrote about the Illinois judiciary as a political institution in a state that popularly elects its judges in competitive elections and gives them enormous patronage powers to shape the make-up of the state judiciary.

44.     His sources for his first two columns consisted of a broad assortment of Republican leaders and lawyers from around Kane County who spoke to him about the politics of the Gorecki case and told him of Thomas's parochial interest in discrediting the county's state's attorney.  According to Page's sources, Thomas's political base was not pleased by the upstart Gorecki's victory in the 2000 primary – she was also the county's youngest state's attorney ever – and was motivated to see her punished severely by the ARDC.

45.     For his third column, which ran after the Supreme Court's ruling, Page received

information from a politically-connected source in Kane County whom he had used regularly in the past and who had always proven to be reliable. This source told him that he had had a conversation at a political fundraising event that led him to believe that Gorecki's four-month suspension was the result of Thomas's relenting on his push for more severe penalties when he learned that Gorecki supporters would be backing Spence in his upcoming judicial election.

46.     In written depositions that would be given in the defamation case, Justice Fitzgerald stated that Thomas had initially urged a one-year sanction for Gorecki, and Justice McMorrow stated that Thomas had at first recommended disbarment. This testimony supported the assertions in the Chronicle that Thomas was "pushing hard for very severe sanctions – including disbarment" and that "Thomas' pressure could result in a 'compromise' – a year's suspension of Gorecki's law license." Both Justice McMorrow and Justice Fitzgerald would later retract their written deposition testimony, pleading confusion and faulty memories, and state that, on second thought, Thomas originally sought a six-month suspension.

47.     Page had no reason to doubt his sources' conclusions about the dynamics underlying the Gorecki disposition, especially in light of what Page understood about Thomas's long history of playing politics on the bench. At trial, for example, Page would testify that when he wrote his columns, he knew that Thomas had made many politically-motivated appointments during his tenure on the Supreme Court, such as naming a campaign contributor's wife, Judge Schostok, to a 19th Judicial Circuit seat, demoting Judge Colwell from his Second Appellate District assignment, and twice placing Judge Spence on the 16th Judicial Circuit.

48.     In a state such as Illinois, which elects a large segment of its judiciary and provides its Supreme Court Justices with significant patronage privileges over other judicial openings, it is hardly surprising that Page's sources would be talking about the politics of a

15

much-publicized and unprecedented attorney disciplinary action whose protagonist and
supporting players were locally prominent law enforcement and legal figures – all of whom
served in a county within the judicial suzerainty of Supreme Court Justice Robert Thomas.

D.  From The Inception Of This Case, The Non-Party Justices Were Material Witnesses
    With Personal Knowledge of Disputed Evidentiary Facts.

    49.    Long before Thomas filed his lawsuit, the Justices of the Illinois Supreme Court
possessed personal knowledge of disputed evidentiary facts and were on notice that they were
likely to be material witnesses in any proceeding he initiated.  Indeed, the Justices learned almost
immediately of Thomas's dispute with the opinion columns in the Chronicle.

    50.    On May 16, 2003, just one day after the first column was published, Supreme
Court Press Secretary Joseph Tybor distributed a memorandum to the Justices about the column,
noting that it touched upon matters that he viewed as "strictly confidential" involving the Court's
business.  See Ex. 5.  Tybor also disclosed that he had spoken to Chronicle managing editor Greg
Rivara about the column and told him that the column was false.  That same day, he sent a
separate memorandum to then-Chief Justice McMorrow, in her role as head of the court system,
asking her to give him a "heads-up" when the Court entered an order in the Gorecki matter
because of the "high interest" in the case.  See Ex. 6, Tybor Dep. at 155:17-24; 298:23-299:14.[2]

    51.    Tybor distributed a second memorandum to the Court on December 14, 2003.
See Ex. 7.  Tybor reminded the Justices that this matter involved "the Gorecki disciplinary case"
and a newspaper columnist who was "critical in various ways of Justice Thomas in connection
with the Gorecki case."  After summarizing the first column again, and describing the second as
a "rehashing" of the first, Tybor discussed the contents of the third column and disclosed that

---

[2]    All citations to the depositions in the state defamation case ("Dep.") are in Ex. 6.

Thomas had sought a retraction. Tybor detailed the five principal subjects that Thomas wanted a retraction to cover, including areas that related specifically to his internal interactions with his colleagues regarding the Gorecki case. Tybor also divulged that he had had further discussions with Rivara in which he disputed the accuracy of the columns and continued to push for a retraction. According to Tybor, Rivara declined to comply with this demand.

52. Not only were the Justices receiving regular written updates on the brewing litigation between Thomas and the <u>Chronicle</u>, they were also talking with Thomas and with Tybor about the publications:

- Justice Fitzgerald recalls Thomas informing him that the columns were false and that he was contemplating litigation. Justice Fitzgerald Dep. Pursuant to Ill. Sup. Ct. R. 210 ("210 Dep.") at 19:20-20:12; 29:7-9; 38:10-12; TR 950:12. He also recalls discussing the contents of a retraction with Chief Justice Thomas and speaking to Tybor about the columns. <u>Id.</u> at 13:13-16; 28:1-4; TR 898:6-9.

- Justice Philip J. Rarick (who retired from the Court in 2004) remembers Chief Justice Thomas telling him that he was distressed, that he had been defamed, and that he was considering a lawsuit. Justice Rarick 210 Dep. at 14:8-12; 18:1-2; 18:25-19:4.

- Justice Garman recalls Chief Justice Thomas telling her that Tybor was attempting to "set[] the record straight" and obtain a retraction from the <u>Chronicle</u>. Justice Garman 210 Dep. at 14:19-21. She also recalls Chief Justice Thomas telling her that he was upset by the allegations in the columns. <u>Id.</u> at 20:5-10.

- Justice Freeman, who testified of his "sympathy" for Chief Justice Thomas because of the columns, spoke to Tybor about the publications. Justice Freeman 210 Dep. at 12:23; 34:10-11. Chief Justice Thomas also recalls hearing from Justice Freeman of his annoyance with the columns and of his suggestion that the Court (or perhaps Justice Freeman himself) send a letter in response. Justice Thomas Dep. at 138:16-139:20; 140:6-16.

- Justice Kilbride remembers speaking with Tybor, Justice Kilbride 210 Dep. at 11:12-13; 19:15-17, and he remembers his own reaction to the content in the <u>Chronicle</u>: "I do recall my response to Mr. Tybor's summary of the statements written by Mr. Page is that I felt it was outrageous as to what he was reporting in terms of what I knew factually did and did not happen concerning the Gorecki disciplinary matter." <u>Id.</u> at 12:4-10. Justice Kilbride also spoke to Chief Justice Thomas about the <u>Chronicle</u>'s claims. "I know that I told him I thought the comments at least in my opinion were outrageous based on factually what I knew to be true that happened in the disciplinary matter. I know that Justice Thomas was upset about the accusations, and rightly so." <u>Id.</u> at 29:4-10.

17

53.     With repeated briefings on the <u>Chronicle</u> columns coming from Tybor and with the Justices speaking with Thomas about the matter, it is no surprise that the dispute between Thomas and the newspaper registered with the Justices as an issue for the Court as a whole.

54.     Justice Freeman, for example, stated that the <u>Chronicle</u> columns "reflect[ed]" upon the "entire court" and "did not just involve Justice Thomas. It was a mark against the entire court." Justice Freeman 210 Dep. at 20:1-2; 23:10-11. He did <u>not</u> see it merely as "a civil dispute involving an individual justice." <u>Id.</u> at 19:22-20:1. Justice Garman echoed these views. Justice Garman 210 Dep. at 14:8-10. Justice Kilbride testified that he read the first column because "it impacts, or should I say it discusses court proceedings and raises a question about the propriety of court proceedings. That's why it was, why I would have read it." Justice Kilbride 210 Dep. at 5:1-5.

E.      <u>Thomas Sues The Kane County Chronicle And Demands Money</u>.

55.     On January 9, 2004, Thomas sued Page, Rivara, and Shaw (collectively, "the <u>Chronicle</u> defendants"). He claimed defamation and false light invasion of privacy arising out of the May 20, 2003 and November 25, 2003 opinion columns. He did not sue over the May 15, 2003 column.

56.     In his complaint, Chief Justice Thomas alleged that he was not biased against Gorecki, did not trade his vote for any favor or political deal, did not try to influence his Supreme Court colleagues with respect to the length or severity of the sanctions against Gorecki, and did not lobby for a one-year suspension of Gorecki's license to practice law. He claimed that the opinion columns depicted him as a "vindictive, petty, and biased human being, who would cut deals for the betterment of himself . . . in violation of his oath as an officer of the court." <u>See</u> Ex. 8.

18

57.     Chief Justice Thomas also asserted that the opinion columns described conduct on his part that would breach the Illinois Code of Judicial Conduct.  He cited six separate provisions of the Code of Judicial Conduct that he believed the newspaper accused him of violating.  Id.

58.     On January 13, 2004, four days after Chief Justice Thomas filed his lawsuit against the Chronicle, Tybor distributed a third memorandum to the Supreme Court Justices informing them of the initiation of the legal action.  Tybor Dep. at 176:11-20.

59.     Reflecting an appreciation for the conflict of interest the Justices of the Supreme Court would inevitably experience as material witnesses when Thomas sued, Justice Kilbride stated:

> [I] do recall early on when this dispute arose and it was clear that there was going to be litigation I offered on at least one occasion that I didn't believe that there should be any discussions among or between any of the justices and Justice Thomas about any matter about his pending litigation.  I didn't think that would be appropriate, so I would presume that Justice Thomas would honor that request.

Justice Kilbride 210 Dep. at 53:5-15.

60.     The Chronicle has 14,000 subscribers.  It is difficult to find the newspaper outside of Kane County.  None of Page's columns were published on the newspaper's website nor were they the subject of any follow-up reporting by other media organizations.  In order to purchase a copy of the Chronicle, Thomas had to drive almost 10 miles from his chambers in DuPage County across the county line to a doughnut shop in Kane County.  At trial, the Chief Justice of the Illinois Supreme Court would demand $17.4 million in damages over the publication of the two opinion columns.

F.      Procedural Irregularities Immediately Define The Chief Justice's Lawsuit As The Material Witnesses On The Illinois Supreme Court Take Judicial Action In The Case.

61.     Thomas filed suit in the Circuit Court for the 16th Judicial Circuit in Kane County.  The 16th Judicial Circuit falls within the Second Appellate District represented by

19

Chief Justice Thomas in the Illinois Supreme Court.

62.     The case was assigned to Judge Donald J. Fabian.  On April 8, 2004, without explanation, Judge Fabian recused himself and recommended that the matter be heard by a judge outside the Second Appellate District.  Judge Fabian transferred the case to the then-Presiding Judge of the Civil Division, Judge Colwell, for further proceedings.  See Ex. 9.

63.     On April 8, 2004, without explanation, Judge Colwell indicated that he intended to contact the Chief Judge of the 16th Judicial Circuit, Phillip J. DiMarzio, to recommend that the matter be reassigned to a judge outside the Second Appellate District.  See Ex. 10.

64.     Upon information and belief, on or before April 15, 2004, without explanation or hearing, Chief Judge DiMarzio of the 16th Judicial Circuit asked the Illinois Supreme Court to assign the case to a trial judge located outside of the 16th Judicial Circuit and the Second Appellate District.

65.     Neither Chief Justice Thomas nor the Chronicle defendants requested the reassignment.  No specific Illinois constitutional provision, court rule, or statute sets out a procedure to transfer cases from one judicial circuit or appellate district to another judicial circuit or appellate district within the state.  General supervisory authority over the court system is vested in the Supreme Court under Art. VI, § 16 of the Illinois Constitution.

66.     Upon information and belief, the request for reassignment of Thomas's personal lawsuit was eventually received by Cynthia Y. Cobbs, the Administrative Director of the Illinois Courts.  Administrative Director Cobbs works closely with Thomas and has reported to him since his elevation to Chief Justice in September 2005.  See Ill. Sup. Ct. R. 30(b).  Cobbs testified at deposition in the defamation case that she recommended the transfer of the case to a trial judge from the Circuit Court of Cook County.

20

67. On April 15, 2004, without explanation or hearing, the Illinois Supreme Court, "having determined that the public necessity so requires," reassigned the case to Judge Donald J. O'Brien, Jr. of the Circuit Court of Cook County to sit by designation in the 16th Judicial Circuit. See Ex. 11.

68. The April 15, 2004 order was signed on behalf of the Illinois Supreme Court by then-Chief Justice McMorrow, who would testify at trial for Chief Justice Thomas that he was a "good" and "honest" man and that there was "no truth" to the editorial opinion columns. TR 1340:11-14; 1341:11-12. As head of the court system at the time and as a Justice from the First Appellate District, then-Chief Justice McMorrow had direct administrative authority over Circuit Judge O'Brien.

69. Thus, from the time Judge Colwell stated that he would speak to Chief Judge DiMarzio about the judicial management of the case, the Chronicle defendants were not privy to the reassignment process or the basis under which it was carried out.

G.     The Participation Of The Illinois Supreme Court Justices In The April 15, 2004
       Reassignment Of Thomas's Personal Lawsuit Violated The Code Of Judicial Conduct
       And The Constitutional Rights Of The Chronicle Defendants.

70. Under Illinois Supreme Court Rule 63(C)(1)(e)(i), a judge "shall disqualify himself or herself" where the judge is a party to a proceeding. No indication exists on the April 15, 2004 order that Thomas recused himself from the reassignment of his own lawsuit. Thomas was thus in the enviable position of not only prosecuting his defamation complaint in the court system which he would control at the time of trial and during key pre-trial proceedings, but also, based on the text of the April 15, 2004 order itself, of apparently having a hand in the selection of the judge who would preside over his lawsuit.

71. It was obvious from Chief Justice Thomas's complaint that his lawsuit would

21

place at issue the internal deliberations of the Illinois Supreme Court in the Gorecki case.  See Ex. 8 at ¶ 24; Count III ¶¶ 31-33, 36-39, 41-43; Count IV ¶¶ 32-33, 36-39, 41-43.  Under well-settled federal constitutional law, in order to prove his claim, the Chief Justice would have to show that the statements in the Chronicle relating to his interactions with his colleagues on the Supreme Court were substantially false and that he suffered actual injury.  See Philadelphia Newspapers, Inc. v. Hepps, 475 U.S. 767, 776-77 (1986); Masson v. New Yorker Magazine, 501 U.S. 496, 516-17 (1991).  Thus, on the face of the complaint, the Chief Justice's colleagues were central figures in the case – their testimony would inevitably and unavoidably become pivotal in Thomas's effort to demonstrate the substantial falsity of the opinion columns and the actual harm he alleged they caused.

72.     Under Art. VI, § 15(h) of the Illinois Constitution, when a member of the Supreme Court comes before the Courts Commission, no other member of the Supreme Court can sit on the Commission for that proceeding.  The Illinois Constitution thus establishes an important norm regarding the inherent bias that permeates a legal proceeding when one member of the Supreme Court participates in a matter involving a fellow Supreme Court Justice.

73.     The Illinois Code of Judicial Conduct addresses bias and the appearance of impropriety in other contexts.  According to the Code, a judge "shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned," including in situations where the judge has "personal knowledge of disputed evidentiary facts," Ill. Sup. Ct. R. 63(C)(1)(a), where the judge is, to the judge's knowledge, "likely to be a material witness in the proceeding,"  Ill. Sup. Ct. R. 63(C)(1)(e)(iv), or where the judge has "more than de minimis interest that could be substantially affected by the proceeding."  Ill. Sup. Ct. R. 63(C)(1)(d).

74.     Despite the relevant provisions in the Illinois Constitution and the Code of

Judicial Conduct, none of Chief Justice Thomas's colleagues on the Illinois Supreme Court recused themselves from the reassignment of his lawsuit when they had personal knowledge of disputed facts, were likely to be material witnesses, and had more than a <u>de minimis</u> interest in the outcome of the proceedings given that the Court considered the dispute over the <u>Chronicle</u> columns from the beginning as implicating the Illinois Supreme Court as an institution and thus all the Justices who served on it.

75.    There were no Justices on the Illinois Supreme Court on April 15, 2004 who were qualified to participate, and the eventual mass recusal of members of the Court on February 8, 2006 supports this conclusion.  No Justice on the Court "grew" into a disqualifying conflict in 2006.  The conflicts were already present in 2004.  The Court had no quorum to issue its first order assigning Circuit Judge O'Brien to preside over the case.

76.    Therefore, the Chief Justice's lawsuit, in which he would ask for more than $17 million in damages when he had no evidence that he was actually harmed, was marked from the very beginning by makeshift, unconstitutional procedures that denied the <u>Chronicle</u> defendants the opportunity to be heard on the question of where the matter would be tried and that permitted the Chief Justice and the Justices of the Illinois Supreme Court to direct a case in which one of their own was a plaintiff (and in which <u>all</u> of them would be material witnesses) to a judicial circuit, and a trial judge, of their own choosing – without any check on their discretion.

77.    Within weeks of the filing of Thomas's complaint alleging that the <u>Chronicle</u> defendants had unfairly depicted him as a person indifferent to judicial ethics and willing to play politics with the court system to advance his personal agenda, Thomas and his colleagues on the Illinois Supreme Court had violated fundamental rules in the Illinois Code of Judicial Conduct designed to prevent judicial bias and the appearance of impropriety – and they had done so in

23

Thomas's own lawsuit.  The unconstitutional irregularities would only grow worse.

H.     Chief Justice Thomas's Supreme Court Colleagues Create A Judicial Deliberation
       Privilege To Protect The Chief And Choke Off The Chronicle Defendants' Discovery.

78.     On June 7, 2004, the <u>Chronicle</u> defendants served answers to interrogatories propounded by Thomas.  In response to a question regarding persons with knowledge of relevant facts, the <u>Chronicle</u> defendants identified Justices Freeman, McMorrow, Fitzgerald, Kilbride, Garman, and Rarick (collective, the "non-party Justices").  <u>See</u> Ex. 12.

79.     On June 23, 2004, the <u>Chronicle</u> defendants issued document subpoenas to the non-party Justices.  The subpoenas sought information concerning the Gorecki case and documents relating to the three opinion columns published in the <u>Chronicle</u>.

80.     On September 1, 2004, the non-party Justices, represented by the Illinois Attorney General, moved to quash the document subpoenas on the basis of what they deemed a "judicial deliberation privilege."  According to the non-party Justices, this privilege prevented any compelled disclosure of the deliberations or decision-making processes of the Supreme Court – even when a sitting Justice affirmatively introduced these deliberations into a legal proceeding by filing a personal defamation lawsuit.

81.     At the time the non-party Justices moved to quash the subpoenas, no authority existed in Illinois recognizing a judicial deliberation privilege.  <u>See</u> <u>Thomas v. Page</u>, 361 Ill. App. 3d 484, 488 (2005).

82.     On November 3, 2004, the <u>Chronicle</u> defendants issued deposition subpoenas to the non-party Justices.

83.     On November 24, 2004, the <u>Chronicle</u> defendants issued subpoenas for depositions and records to Chief Justice Thomas's law clerks.  The records requested from the

law clerks were similar to those requested from the non-party Justices.

84.     On November 29, 2004, ruling on the motion of the non-party Justices to quash the document subpoenas, the Circuit Court became the first court in Illinois to recognize a judicial deliberation privilege.  See Ex. 13.

85.     On December 6, 2004, Justice Rarick retired and was replaced by Justice Karmeier.  Justice Rarick remained a party to the subpoena proceeding.

86.     On December 17, 2004, the non-party Justices and the law clerks (also represented by the Attorney General) filed a motion to quash the deposition subpoenas.

87.     On January 25, 2005, the Circuit Court found that the judicial deliberation privilege extends to the communications between law clerks and the justices for whom they work, but that it does not cover communications between one justice and another justice's law clerks or communications between or among law clerks.  See Ex. 14.

88.     On March 28, 2005, on its own motion, the Circuit Court certified five questions for interlocutory review pursuant to Illinois Supreme Court Rule 308.  The Circuit Court took this step because it recognized that the litigation surrounding the judicial deliberation privilege was "a case of first impression in Illinois involving a question of law in which there is a substantial ground for difference of opinion."  See Ex. 15.  The five certified questions related to whether Illinois should recognize a judicial deliberation privilege as well as to the nature, scope, and applicability of such a privilege to Chief Justice Thomas's case.

89.     On April 11, 2005, the Chronicle defendants joined with the non-party Justices in a Joint Petition for Leave to Appeal the certified questions to the Second District of the Illinois Appellate Court, the court which hears appeals from Kane County and the 16th Judicial Circuit. See Ex. 16.

25

I.      The Illinois Supreme Court Makes A Second <u>Sua Sponte</u> Intervention In Violation Of The Code Of Judicial Conduct And The Constitutional Rights of the <u>Chronicle</u> <u>Defendants, This Time As Parties To The Interlocutory Appeal</u>.

90.      On its own motion, and without explanation or hearing, the Supreme Court of Illinois transferred the Joint Petition for Leave to Appeal to judges sitting on the First District of the Illinois Appellate Court. <u>See</u> Ex. 17. The April 15, 2005 order was signed on behalf of the Supreme Court by then-Chief Justice McMorrow, who would eventually disqualify herself from this case and who directly supervised all the First Appellate District judges in her role as both then-Chief Justice and Supreme Court Justice from the First District.

91.      Once again, no indication exists on the face of the reassignment order that Thomas disqualified himself from the transfer of his own case. His failure to recuse himself from a matter in which he was a party would violate Illinois Supreme Court Rule 63(C)(1)(e)(i).

92.      Since the inception of his lawsuit against the <u>Chronicle</u> defendants, Chief Justice Thomas has not participated in defamation cases and in cases in which either his trial counsel or the <u>Chronicle</u> defendants' counsel has appeared. <u>See</u>, <u>e.g.</u>, <u>Tuite v. Corbitt</u>, 224 Ill. 2d 490 (2006); <u>Imperial Apparel, Ltd. v. Cosmo's Designer Direct, Inc.</u>, 222 Ill. 2d 572 (2006) (table case); <u>Price v. Philip Morris, Inc.</u>, 219 Ill. 2d 182 (2005); <u>Hanno v. Std. Fed. Bank for Savings</u>, 212 Ill. 2d. 532 (2004) (table case). While the Chief Justice's recusals in these appeals highlight yet another way in which his litigation against the <u>Chronicle</u> defendants has affected the administration of justice in Illinois, at least in these cases Chief Justice Thomas prominently disqualified himself due to his personal interest and the appearance of impropriety. In none of the Supreme Court orders specially assigning judges to hear his own lawsuit has the Chief Justice or the Supreme Court noted his recusal.

93.      At the time of the second reassignment by the Illinois Supreme Court, the non-

party Justices, including then-Chief Justice McMorrow who signed the April 15, 2005 order, were interested persons in the litigation, likely to be material witnesses, in possession of disputed evidentiary facts, and had more than a de minimis interest in the proceedings. Their names appeared in the caption of the case as "Non-party Petitioners." The non-party Justices were therefore precluded from participating in the case under Illinois Supreme Court Rules 63(C)(1)(a), 63(C)(1)(d), and 63(C)(1)(e)(i, iv).

94.     Moreover, in reassigning the interlocutory appeal, the Supreme Court transferred it to judges from the First Appellate District. Three of the seven Supreme Court Justices come from the First Appellate District. Along with Chief Justice Thomas, they constitute a majority of the Supreme Court. Reassigning this case, where so much is at stake for the Illinois judiciary, to the district where judicial power in the state is at its greatest concentration, prejudiced the Chronicle defendants.

95.     On April 18, 2005, Robert J. Mangan, Clerk of the Second District of the Illinois Appellate Court, issued an order, pursuant to the April 15, 2005 order of the Illinois Supreme Court, assigning judges from the First District of the Illinois Appellate Court to sit as the Second District of the Illinois Appellate Court. See Ex. 18.

96.     The First Appellate District is divided into six divisions. Under the Appellate Court Rules for the First Appellate District, all cases "shall be assigned by computerized random assignment" to a division of the court. See First App. Dist. R. 3(B).

97.     On April 20, 2005, Justice Alan J. Greiman, Chair of the Executive Committee of the First District of the Illinois Appellate Court, assigned Justices Thomas E. Hoffman, Sheila M. O'Brien, and Robert Cahill to the appeal. See Ex. 19. Justice Cahill sits in the First Division. Justice Hoffman sits in the Second Division. Justice O'Brien sits in the Fifth Division.

27

98.     The April 20, 2005 order did not follow the local practice in the First Appellate District of randomly assigning cases by computer to judges from a single division of the court. Instead, the three judges assigned to decide the interlocutory appeal came from three different divisions of the First Appellate District.  Justice Greiman – who sits on the First Appellate District bench by assignment from the Illinois Supreme Court – appears to have hand-picked the panel to hear the appeals in Thomas's defamation case.

99.     On May 9, 2005, the Illinois Supreme Court voted Thomas into the position of Chief Justice.

100.     On May 9, 2005, Appellate Court Justices Hoffman, O'Brien, and Cahill granted the Joint Petition for Leave to Appeal the certified questions.  They stayed all discovery from the Supreme Court Justices and their clerks and staff pending resolution of the appeal.  See Ex. 20.

101.     On May 24, 2005, in a hearing before the Circuit Court, counsel for the Chronicle defendants suggested that because of the complicated nature of the questions at issue, the judicial deliberation privilege would finally have to be decided by the Illinois Supreme Court.  In response, the Circuit Court Judge stated, "I don't think the Supreme Court will take this in a million years."  See Ex. 21.

J.     The "Judicial Deliberation Privilege" Is Created – By Judges, For Judges.

102.     On September 27, 2005, the appeal was argued before Justices Hoffman, O'Brien, and Cahill.

103.     In their briefs to the Appellate Court, the non-party Justices, who of course made up a majority of the Illinois Supreme Court, told their judicial subordinates on the Appellate Court what the law would be – that a judicial deliberation privilege exists in Illinois, see Ex. 22 at 1-19, that it is absolute, id. at 20-26, that it covers law clerks, including conversations between

28

law clerks and between a Justice and a clerk who works for another Justice, see Ex. 23 at 10-25, and that it can be waived by individual judges at the same time it is maintained by other judges on the same panel.  See Ex. 22 at 31-36.

104.    On September 6, 2005, Thomas began his three-year term as Chief Justice.

105.    On October 20, 2005, the Appellate Court issued its decision.  In an opinion authored by Justice Hoffman and joined by Justices O'Brien and Cahill, the Appellate Court judges agreed across the board with the non-party Justices who are their judicial superiors and who hold supervisory and administrative powers over them.

106.    The Appellate Court established a judicial deliberation privilege protecting communications between judges, between judges and law clerks, and between law clerks.  See Thomas, 361 Ill. App. 3d at 494.  Going beyond the trial court ruling, the Appellate Court became the first court in the nation to find that a judicial deliberative privilege was absolute in nature.  Id. at 493-94.  The October 20, 2005 decision from the Appellate Court also marked the first time in modern Illinois history that a testimonial privilege was established by a common-law appellate court rather than by the state legislature, an action that contradicts the Illinois Supreme Court's approach in People ex rel. Birkett v. City of Chicago, 184 Ill. 2d 521, 533-34 (1998), where the Court refused to create a deliberative process privilege because the creation of a privilege is "presumptively a legislative task."

107.    It is well-established that courts will dismiss a defamation action when the defense of the action requires access to privileged information.  See Fitzgerald v. Penthouse, 776 F.2d 1236, 1242-44 (4th Cir. 1985) (dismissing defamation action due to government's assertion of "state secrets privilege"); Trulock v. Lee, 66 Fed. Appx. 472, 476 (4th Cir. 2003) (dismissal warranted under state secrets privilege because "basic questions about truth, falsity, and [actual]

malice cannot be answered without the privileged information").

108.    Chief Justice Thomas and the Illinois judiciary, on the other hand, ignored these principles of basic fairness as well as the constitutional rights of defendants sued by the most powerful judicial official in the state.  In a defamation case prosecuted by the Chief Justice attacking editorial opinion in a small community newspaper, the Illinois judiciary barricaded itself behind a wall of privilege that made it impossible for the <u>Chronicle</u> defendants to defend themselves.

K.    The Chronicle Defendants Exercise Their Right To Seek Further Appellate Review.

109.    On November 28, 2005, the <u>Chronicle</u> defendants filed a Petition for Leave to Appeal to the Illinois Supreme Court and a contemporaneous motion to disqualify the Justices of the Illinois Supreme Court from hearing the Petition for Leave to Appeal.

110.    In the motion, the <u>Chronicle</u> defendants asserted that the all of the Justices were disqualified from hearing the appeal – Chief Justice Thomas because he was the plaintiff in the lawsuit; Justices McMorrow, Freeman, Fitzgerald, Garman, and Kilbride because they were material witnesses in the defamation case and petitioners in the interlocutory appeal; and Justice Karmeier because, as the junior member of the Court, he could not sit in judgment over his six senior colleagues without creating an appearance of bias and impartiality.

111.    On November 28, 2005, the <u>Chronicle</u> defendants also filed an Application for a Certificate of Importance with the Appellate Court pursuant to Illinois Supreme Court Rule 316. Under Rule 316, when the Appellate Court certifies a question as being "of such importance that it should be decided by the Supreme Court," the appeal must be accepted and heard by the Supreme Court as a matter of right.

112.    On December 19, 2005, the same judges who two months earlier were the first appeals court judges in Illinois to recognize a judicial deliberation privilege, the first appeals

court judges in the nation to recognize an <u>absolute</u> judicial deliberation privilege, and the first appeals court judges in modern Illinois history to establish an evidentiary privilege by judicial fiat, denied the Application for a Certification of Importance without explanation.  <u>See</u> Ex. 24.

113.    But two explanations do exist.  First, granting the Application for a Certificate of Importance would have been futile because the non-party Justices who commanded a solid majority on the Illinois Supreme Court had been telling the Appellate Court for months – in their briefs – what the law would be.  Indeed, on December 21, 2005, counsel for Chief Justice Thomas wrote a letter to the Circuit Court stating that the possibility of reversing the judicial deliberation privilege ruling at the Illinois Supreme Court was "slim to none since the non-party justices have taken the position in court that there is a judicial privilege."  <u>See</u> Ex. 25.

114.    The Supreme Court was doing more than just looking over the Appellate Court's shoulder.  As later developments would show – developments which provide the second explanation for why the Application for a Certification of Importance was denied – if the Appellate Court had ruled against the non-party Justices, the non-party Justices would have no way to fix the "error" because they would lack a quorum to do so.  The Certificate of Importance was denied because there was no Illinois Supreme Court to hear the case.

115.    The Appellate Court thus had but one choice and that choice was to do what the non-party Justices told it to do.  The existence of the judicial deliberation privilege was not litigated.  It was dictated.  The instructions were coming from Justices of the Illinois Supreme Court who were literally establishing state law in a case in which they were the key witnesses, had knowledge of disputed evidentiary facts, and were parties to the interlocutory appeal. Moreover, for the Justices, the case was never just about Thomas.  It was also about the public image of the Court as a whole, as their testimony strikingly shows.  But their personal

31

involvement as material witnesses for Thomas and as creators of their own deliberation privilege is irreconcilable with the judicial functions they repeatedly took on in the lawsuit.

L.     The Circuit Court Brushes Aside Due Process Concerns About A "Viable" Appellate Route For The Chronicle Defendants As An Issue For "Another Day".

116.    On November 30, 2005, the Chronicle defendants filed a motion to dismiss on the grounds that the lawsuit could not go forward for equitable and public policy reasons because the judicial deliberation privilege insulated the non-party Justices from discovery and prevented the Chronicle defendants from effectively seeking evidence relating to the truth of the facts in the opinion columns.

117.    Also on November 30, 2005, the Chronicle defendants filed a motion to strike allegations in the complaint and to grant judgment on the pleadings or, in the alternative, to compel the non-party Justices and law clerks to respond to discovery requests.  This motion argued that Chief Justice Thomas could not unilaterally waive the judicial deliberation privilege, that allegations in his complaint relating to privileged material must therefore be stricken, and that without this material the Chief Justice could not state a claim for defamation or false light. (The October 20, 2005 panel opinion in Thomas v. Page had not decided any issues surrounding the waiver of the judicial deliberation privilege.  See 361 Ill. App. 3d at 496.)

118.    At a hearing on December 14, 2005, the following colloquy took place between counsel for the Chronicle defendants and the Circuit Court Judge regarding the November 28, 2005 Petition for Leave to Appeal filed by the Chronicle defendants:

> THE COURT:        Who is going to hear it?
> MR. MANDELL:       I think the Supreme Court would make the decision to
>                    disqualify themselves as being –
> THE COURT:        That's what I mean, but do we have a second Supreme
>                    Court in Illinois besides what I already know that we have
>                    seven sitting up there now? Who will act as a Supreme

32

|                | Court if they grant your motion to recuse? |
|                | * * * |
|                | I'm not taking a position on whether it is or it isn't, but let's assume they agree that it's inappropriate to hear it. Who is going to hear it? . . . <u>[I]f one analyzes your viable appeal, you don't have a viable appeal because there is no second Supreme Court.</u> |
| MR. MANDELL:   | Well, then we don't have due process. |
| THE COURT:     | Well, <u>that's something you'll have to reserve for another day</u>. |

<u>See</u> Ex. 26 (emphasis added).

119.    To the <u>Chronicle</u> defendants, the Circuit Court's observation about the lack of a "viable appeal" was hardly surprising.  It was obvious to everyone involved in the defamation case that the Chief Justice was no ordinary plaintiff.  As head of the state court system, he would unquestionably loom over both the trial and the appeal.

120.    But as the state proceedings went on, with each casual allusion by the Circuit Court Judge to Chief Justice Thomas's judicial rank, with each exclamation from the bench that the Illinois Supreme Court would not touch the case "in a million years," and with each concession that the <u>Chronicle</u> defendants lacked a "viable appeal" and had to push off their constitutional due process concerns to "another day," the <u>Chronicle</u> defendants came to think that the Circuit Court itself had presumed that the appellate process was prejudged and influenced by improper factors to the point that they had no chance of prevailing in a fair hearing.

121.    The appellate phase of any public-official defamation case is unusually important, as approximately two-thirds of plaintiff verdicts appealed in such cases are reversed by judges applying the special rules of <u>de novo</u>, independent appellate review mandated by <u>Bose</u>.  <u>See</u> Media Law Res. Ctr. Bulletin, Issue 1, <u>2007 Report on Trials and Damages</u> (Feb. 2007).  In Chief Justice Thomas's case, however, the appellate judges in whom the constitutional obligation of independent appellate review would be entrusted serve under both the plaintiff and the

Supreme Court Justices who testified on his behalf.  For this reason, a <u>Bose</u> review is not possible in the Illinois appellate courts at this time.

M.    The Chief Justice's Defamation Case Has Created "Second-Class Citizens" In Illinois, <u>But The Circuit Court Fails To See Who The "Second-Class Citizens" Are.</u>

122.    On February 1, 2006, the Circuit Court denied the motion to dismiss.  The Circuit Court wrote that dismissal of the Chief Justice's defamation suit would result in "an open season on Illinois judges" and make state judges "the only citizens of the State of Illinois who could not seek redress in the Courts of Illinois."  <u>See</u> Ex. 27.  If sitting state judges could not bring defamation suits, according to the Circuit Court, they "would be denied due process and equal protection of the law contrary to both the Federal and State Constitutions." <u>Id.</u>

123.    On February 1, 2006, the Circuit Court also denied the motion to strike and to grant judgment on the pleadings, or, in the alternative, to compel discovery responses.  The Circuit Court held that the judicial deliberation privilege was owned by each individual Justice, that it could only be waived by that Justice, and that only the Chief Justice had waived his privilege.  The Circuit Court wrote that to deny selective waiver of the privilege would "make individual Justices sitting ducks for defamatory articles" and "would relegate Judges to the status of second class citizens."  <u>See</u> Ex. 28.

124.    The <u>Chronicle</u> and its columnist and editor would soon make a discovery:  <u>they</u> were the "second class citizens" who "could not seek redress in the Courts of Illinois" and who were therefore "denied due process and equal protection of the law."

N.    <u>The Illinois Supreme Court Finally Purports To Recuse Itself</u>.

125.    Under Art. VI, § 3 of the Illinois Constitution, "Four Judges constitute a quorum and the concurrence of four is necessary for a decision."

126.     This provision makes no exceptions.  The Supreme Court's website draws a similarly absolutist line, stating, "A quorum of four Justices is required for <u>transaction of Court business</u> and there must be agreement among at least four Justices on <u>any</u> decision or opinion rendered by the Court." (emphasis added).  <u>See</u> Ex. 29.

127.     No specific provision exists in the Illinois Constitution, in the Illinois Supreme Court rules, or in the Illinois statutes for the temporary replacement of disqualified Justices on the Supreme Court or an alternative method of obtaining Supreme Court action when a quorum is unavailable.

128.     On February 8, 2006, the Illinois Supreme Court issued an order on the <u>Chronicle</u> defendants' motion to disqualify the Justices of the Supreme Court and to grant the Petition for Leave to Appeal.  In the order, without explanation or citation to legal authority, the Supreme Court stated that five of the Justices (Chief Justice Thomas and Justices McMorrow, Fitzgerald, Kilbride, and Garman) would not take part in any substantive ruling on the Petition for Leave to Appeal.  The Court also stated that two members (Justices Freeman and Karmeier) would <u>not</u> disqualify themselves from hearing the pending Petition for Leave to Appeal.  <u>See</u> Ex. 30. Justice Freeman was one of the non-party Justices claiming the judicial deliberation privilege at issue in the Petition for Leave to Appeal.

129.     The February 8 order does not indicate how Justices Freeman and Karmeier would have voted, however, because with only two judges taking part in the proceeding, the Supreme Court did "not have the constitutionally mandated quorum necessary to render a substantive ruling on the pending petition for leave to appeal."  The Petition for Leave was therefore neither granted nor denied.  <u>Id.</u>

130.     The Illinois Supreme Court, which had already twice issued orders reassigning

Chief Justice Thomas's suit to a judicial circuit and appellate district of its own choosing (and at neither time provided notice or an opportunity to be heard to the <u>Chronicle</u> defendants), had at last removed itself from participation in the case – or so it said. Because Illinois law provides no specific mechanism to appoint temporary judges to sit <u>pro</u> <u>hac</u> <u>vice</u> as the state Supreme Court when individual Justices are recused, upon information and belief, for the first time in state history, a litigant was denied the right to have its Petition for Leave to Appeal decided on the merits – granted or denied – by the Illinois Supreme Court. Apparently for the first time since Illinois adopted a two-tiered system for appellate review in 1964, a party was told that, as far as it was concerned, the top tier of judicial review did not exist.

131.    In the February 8 order, however, the Supreme Court stated, without explanation or citation to legal authority, that "to the extent necessary to provide the constitutionally mandated quorum needed to return the case to the circuit court for further proceedings, Justices McMorrow, Fitzgerald, Kilbride, and Garman join with Justice Freeman and Justice Karmeier in ordering only that the mandate be issued to the circuit court forthwith, pursuant to the judgment of the appellate court." <u>Id.</u>

132.    Having just disqualified itself from the proceeding, the Illinois Supreme Court nonetheless conjured a quorum to return the case to the Circuit Court for trial with the judicial deliberative privilege that its members had won as litigants for their Chief Justice fully intact.

133.    Unlike the Supreme Court's previous two orders in the case, which were signed by then-Chief Justice McMorrow, the February 8, 2006 order was not signed at all – <u>not</u> by Chief Justice Thomas, <u>not</u> by the next Justice in seniority, <u>not</u> by any member of the Supreme Court.

O.    The <u>Chronicle</u> Defendants Are Shackled During Discovery By The Judicial Deliberation <u>Privilege</u>.

134.    The Illinois court system had supported and sustained the Chief Justice's lawsuit

36

by building a protective barrier around the official business of the courts. The newly-minted judicial deliberation privilege rendered the <u>Chronicle</u> defendants unable to support fully the truth of the facts in the opinion columns and to challenge aggressively Thomas's allegations of falsity. Under the privilege, the <u>Chronicle</u> defendants were permitted the barest of discovery and cross-examination of the non-party Justices and the Supreme Court staff.

135.    More specifically, the <u>Chronicle</u> defendants were not allowed to ask the non-party Justices whether 1) they communicated with individuals in the Kane County legal community about Chief Justice Thomas's possible bias in the Gorecki matter; 2) they discussed the first two <u>Chronicle</u> columns with Thomas or anyone else; 3) they discussed Thomas's defamation complaint with anyone other than Thomas himself; 4) they thought less of Thomas because of the defamation complaint; and 5) they play any particular role in attorney disciplinary cases as Supreme Court Justices.

136.    While the newspaper was told that it would be allowed to question the Chief Justice about the Gorecki matter and to ask the non-party Justices about Thomas's expressed views of the case, the <u>Chronicle</u> defendants' discovery and cross-examination rights were a sham given that they were prohibited from probing the non-party Justices about the crucial give-and-take that occurred between the Chief Justice and his colleagues as the Gorecki case moved forward through the Illinois Supreme Court.

137.    The <u>Chronicle</u> defendants' handicaps did not end with the limitations imposed by the judicial deliberation privilege. To the extent that the defendants sought to depose the non-party Justices on <u>any</u> topic, the Circuit Court Judge, who had earlier let it be known that he believed that the non-party Justices who are his ultimate administrative supervisors within the court system were the "innocent people here," <u>see</u> Ex. 31, required that the depositions take place

37

on written questions.  <u>See</u> Ex. 32.  The non-party Justices were permitted to review the questions beforehand.  They were also permitted to object to questions in advance and have the Circuit Court Judge rule on those objections in advance.  Neither the <u>Chronicle</u> defendants nor their counsel were allowed to attend the depositions.  Only a court reporter was present to transcribe the answers.

138.  This was not discovery; it was court-controlled stenography.

139.  In a March 14, 2006 hearing, in response to an argument from the <u>Chronicle</u> defendants that written depositions would "inhibit effective cross-examination" at trial, the Circuit Court Judge stated, "[t]he fallacy of this argument is that the argument assumes the nonparty witnesses will be called in Plaintiff's case.  Because the whole deliberative process has been taken off the table, it is highly unlikely that the justices will be called by the Plaintiff."  <u>See</u> Ex. 33.

140.  The Circuit Court Judge was mistaken.  The Chief Justice called <u>all</u> of the non-party Justices to testify at trial.

141.  At her May 22, 2006 deposition upon written interrogatories, former Chief Justice McMorrow stated that when the Illinois Supreme Court took its impression vote in <u>In Re Gorecki</u> following the September 2003 oral argument, she argued for a four-month suspension while Justices Thomas and Garman both voted for disbarment or a suspension of at least six months before changing their minds.  Justice McMorrow 210 Dep. at 15:18-16:4.

142.  After former Chief Justice McMorrow tried to alter her answers subsequent to the written deposition – she had been contacted by Justice Garman, who told her that she had misremembered the facts (TR 1343:10-1347:24) – the Circuit Court ruled that she had waived her judicial deliberative privilege and finally relented to her oral deposition.  <u>See</u> Ex. 34.

However, even at this oral deposition, the former Chief Justice, who had retired on July 6, 2006 and who appointed Justice Burke to replace her, could only be questioned about her own and Chief Justice Thomas's deliberations in the Gorecki matter and not the deliberations of Justice Garman or other members of the Supreme Court.

P.    Page's Sources Are Intimidated And Fear Retaliation.

143.    Due to Chief Justice Thomas's enormous power to make – or break – careers in Illinois, numerous fact witnesses, including sources for the three opinion columns, were afraid of being drawn into the lawsuit out of concern for the professional consequences of testifying against an influential judge with a track record of exercising his political authority in the state court system with some ruthlessness.

144.    For his part, Chief Justice Thomas used the defamation litigation as a means of trying to force the Chronicle defendants to disclose their sources to him.  On August 5, 2005, he filed a motion to divest the newspaper of the protections of Illinois's statutory reporter's privilege and to provide him with the identities of his accusers.

145.    On October 14, 2005, the Circuit Court denied the motion.  See Ex. 35.

146.    However, on October 11, 2006, just two weeks before trial, the Circuit Court reconsidered its ruling at Chief Justice Thomas's request and held that the Chronicle defendants must disclose their sources.  See Ex. 36.  Although the trial court used the new and judicially-created judicial deliberation privilege to cloak the Supreme Court's communications in absolute secrecy, it found that the statutorily-enacted reporter's privilege must yield to Chief Justice Thomas's professed need for disclosure.  Id.

147.    The sources, however, were understandably afraid to have their names divulged to Thomas and to testify against the top judge in the state.  The Chronicle defendants respected the

concerns of their sources and sought a way to protect them before the start of trial.

148.     On October 17, 2006, the <u>Chronicle</u> defendants entered into a stipulation with Chief Justice Thomas, the terms of which allowed them to keep their sources confidential but which limited their testimony at trial to an assertion that they had sources and that the columns accurately reflected the information that the sources provided.  <u>See</u> Ex. 37 at ¶ 6.  The <u>Chronicle</u> defendants were unable to testify about the background, credibility, or reliability of the sources or attribute specific parts of the columns to any source.

Q.     The Grip Of The Judicial Deliberation Privilege And Other Rulings Suffocate The <u>Admission Of Evidence At Trial</u>.

149.     On October 17, 2006, the Circuit Court dismissed with prejudice Rivara as a defendant in the defamation case.  <u>Id.</u> at ¶ 5.

150.     On October 25, 2006, the trial began in the Kane County Courthouse.

151.     During trial, all six non-party Justices testified for Chief Justice Thomas, including four on one day.  Due to the constraints imposed on the <u>Chronicle</u> and Page by the judicial deliberation privilege, they were denied a full opportunity to cross-examine the non-party Justices regarding the Gorecki case and other matters directly relevant to the truth and the subject matter of the editorial opinion columns.

152.     For example, the Circuit Court prevented the <u>Chronicle</u> and Page from questioning the non-party Justices in the following areas:

•     the punishment Chief Justice Thomas sought for Gorecki in relation to the votes of the other justices (TR 914:15-915:16; 1274:10-1275:24);

•     the evolution of the deliberations regarding Gorecki's punishment (TR 2341:19-2342:14);

•     the truth of the statement in the May 15 column: "Other justices do not agree, with at least two opting for simple censure, but Thomas' pressure could result in a compromise –

a year's suspension of Gorecki's law license" (TR 914:15-915:16); and

•    the practices the Supreme Court Justices follow in determining punishments for attorneys in ARDC proceedings (TR 2341:19-2342:14).

153.    These citations do not include the numerous aspects of the Gorecki case that the Chronicle and Page knew prior to trial were strictly off-limits under the judicial deliberation privilege, such as the non-party Justices' impression votes, any compromises they made during deliberations, and how each non-party Justice came to his or her own decision in the case.

154.    The Circuit Court also prevented the Chronicle and Page from fully investigating the inconsistency in the deposition testimony of Justice McMorrow, author of the Gorecki opinion, regarding Chief Justice Thomas's votes in the case.  After her written deposition, in which she stated that Thomas initially favored disbarment, Justice McMorrow testified in her oral deposition and at trial that she had confused In Re Gorecki with another disciplinary case, In Re Timpone.  TR 1304:3-1327:6.  The Circuit Court, however, prohibited the Chronicle and Page from asking Justice McMorrow questions at trial that would reveal that it was Justice Garman – a known ally of Chief Justice Thomas on the Supreme Court – who brought this discrepancy to her attention.  TR 1343:10-1347:24.

155.    Additionally, testimony concerning the support from Gorecki's political base provided to Judge Spence for his 16th Judicial Circuit race – testimony that went to the heart of the November 2003 column – was barred.  The Circuit Court would not admit evidence that Judge Donald T. Anderson, a long-time friend of the Gorecki family and a Kane County political power broker, communicated with various Gorecki followers about backing Judge Spence's campaign.  See Ex. 38 at 39:4-56:1; 61:1-64:7.  Nor was the jury permitted to hear about Gorecki supporters who made contributions to Spence's campaign, id. at 55:7-56:1; 70:10-71:10, or about a telephone call from Anderson to Gorecki's father two days after Anderson spoke with Chief

Justice Thomas and told the Chief Justice – with whom he had no relationship prior to the fall of 2003 – that he was in favor of Spence's candidacy.  Id. at 54:23-55:6.  Similarly, the Chronicle and Page could not introduce evidence of the political contributions the Chief Justice's trial counsel had made to members of the Illinois Supreme Court, such as Justices Freeman and Fitzgerald.  See Ex. 39 at VII(11).

R.    The Chief Justice Shows No Harm To Reputation As The Circuit Court Takes The "Opinion" Out Of The Opinion Page.

156.    The trial was marked by other unusual developments.  For example, the Circuit Court refused to allow the jury to determine whether the words in the columns were defamatory.  Instead, it made a sua sponte ruling that the columns were defamatory per se.

157.    After its defamatory per se finding, the Circuit Court compounded its error by allowing the jury to consider only some of the context surrounding the publication of the opinion columns.  While the Circuit Court allowed the Chief Justice to present enlarged versions of the columns mounted on poster board to the jury, it prohibited the Chronicle and Page from referring to the section of the newspaper where the columns were published as the editorial/opinion page and required the Chronicle and Page to redact entirely the headline "Opinion" that was emblazoned in bold 60-point type at the top of the very page on which the columns were printed.  The Circuit Court further prohibited any discussion of the difference between an editorial columnist and a newspaper reporter.

158.    In support of his claim, Chief Justice Thomas did not present any witnesses who thought less of him after the columns were published.  He could point to no other negative consequences from their publication – no Judicial Inquiry Board investigation, no FBI investigation, no Courts Commission investigation, no criminal investigation, and no follow-up questions from other reporters.  TR 2534:5-15; 2585:1-4; 3522:17-3523:2.  His career has only

42

flourished since the columns were published. Numerous organizations around the state have honored him in recent years, and his colleagues have elevated him to Chief Justice.

159. There was also no medical evidence of emotional distress to support the Chief Justice's damages claim. His clerk at the Supreme Court testified that he had displayed some anger, TR 598:8-24, but his colleagues on the bench said that he never exhibited signs that he was suffering from mental distress. TR 726:19-21; 1242:8-18; 1404:17-1406:5. Chief Justice Thomas himself testified that he did not consult a doctor and complained only of "general weariness" and "stress" without any physical manifestation of either. TR 2422:21-2423:16; 2582:14-22.

160. Finally, Chief Justice Thomas failed to present any evidence of future economic loss on either of the theories he propounded at trial – the alleged harm to his ambition to become an equity partner at a major Chicago law firm and the alleged harm to his goal of securing a seat on the federal bench. Thomas's theories were nothing but rank speculation and created for public consumption the unseemly sight of the state's top judicial officer leveraging his position on the state Supreme Court as a "stepping stone" to a more lucrative or prestigious job.

161. By advertising his desire to procure a high-paying law firm position or a federal judgeship, the Chief Justice has undercut, in yet another way, the reputation and institutional autonomy of the state court system.

162. From the outset of this dispute, it should have been apparent to the non-party Justices that they would be material witnesses in the event of a lawsuit. During their written depositions and at trial, they delivered testimony on issues ranging from the allegations of falsity to the claims for damages, including:

- assertions that the columns were not true and that Thomas conducted himself with integrity on the bench, TR 898:14, 948:8, 948:20-21, 949:5 (Justice Fitzgerald); 1217:3, 1247:2 (Justice Garman); 1341:11-12, 1340:10 (Justice McMorrow); 1363:7-8, 1377:8, 1379:1, 1381:2 (Justice Freeman); 1421:14, 1423:11-14, 1424:7 (Justice Kilbride);

- statements that Thomas had no bias toward Gorecki, TR 897:11 (Justice Fitzgerald); 1214:8, 1214:12-13 (Justice Garman); 1282:17 (Justice McMorrow); 1362:5-6, 1362:23, 1363:1, 1378:19-22, 1379:1 (Justice Freeman); 1418:24, 1423:22 (Justice Kilbride); and

- speculations that a position on the federal bench or with a large Chicago law firm was possible for a Justice of the Supreme Court, TR 957:3-6, 958:3-5 (Justice Fitzgerald); 1203:2-3, 1247:3-1249:2 (Justice Garman); 1338:21-1339:14 (Justice McMorrow); 1368:18-1375:9, 1414:3-1414:24 (Justice Freeman); 1425:10-21, 1435:2-5 (Justice Kilbride); Justice Kilbride 210 Dep. at 60:16-61:3, 64:18-23, 67:1-6.

163. On November 13, 2006, Chief Justice Thomas rested. In closing arguments, the Chief Justice asked the jury for $7.7 million for economic loss, $7.7 million for damage to reputation, and $2 million for emotional harm. His total plea was for $17.4 million in damages.

164. On November 14, 2006, the jury rendered a $7 million verdict for the Chief Justice – $1 million for future economic loss, $5 million for damage to reputation, and $1 million in emotional harm. Judgment was entered the same day. See Ex. 40.

S. A "Shocked" Circuit Court Sustains The Windfall To The Chief Justice.

165. The $7 million jury verdict was the largest compensatory damage award in Illinois history in a defamation case.

166. On January 12, 2007, the Chronicle and Page filed a post-trial motion for judgment notwithstanding the verdict, new trial, or remittitur.

167. On March 30, 2007, the Circuit Court denied the motion for new trial and denied in part and granted in part other aspects of the post-trial motions, leaving Chief Justice Thomas's personal windfall at $4 million.

168. The Circuit Court left intact the $1 million awarded for emotional harm. It vacated the jury's award of $1 million for future economic harm. Regarding the request for

remittitur of the $5 million award for reputational harm, the Circuit Court wrote, "Considering the <u>paucity of evidence</u> on this item of damages, the court finds that such an award falls outside the range of fair and reasonable compensation, was the result of passion and prejudice, and <u>shocks this judicial conscience</u>." <u>See</u> Ex. 41 (emphasis added).

169. Notwithstanding the "shock" and the "paucity" of evidence, the Circuit Court left the Chief Justice with $3 million to compensate him reputationally and $1 million emotionally for a pair of editorial opinion columns in a 14,000-subscriber, community newspaper when the Circuit Court found at the same time that he had absolutely no economic harm.

170. On April 9, 2007, the Chief Justice accepted the remittitur in lieu of a new trial on the issue of damages.

171. On April 27, 2007, Page and the <u>Chronicle</u> filed a timely notice of appeal to the Second Appellate District.

172. On April 30, 2007, Chief Justice Thomas filed a notice of cross appeal asking for the reinstatement of the full defamation verdict of $7 million.

T. **Having Supposedly Disqualified Itself Due To The Absence Of A Quorum To Act, The Illinois Supreme Court Makes A Third <u>Sua Sponte</u> Appearance In Violation Of The Code Of Judicial Conduct And The Constitutional Rights Of The Chronicle Defendants.**

173. On May 4, 2007, without notice or explanation, the Illinois Supreme Court issued yet another order in the state defamation action. <u>See</u> Ex. 42. The May 4 order assigned judges from the First Appellate District to the Second Appellate District for the purpose of hearing the appeal of Chief Justice Thomas's defamation judgment. The order was signed on behalf of the Illinois Supreme Court by Justice Freeman, who as a Supreme Court Justice from the First Appellate District has direct supervisory and administrative authority over the Appellate Court judges sitting in the First Appellate District. There is no indication on the face of the May 4

45

order that Chief Justice Thomas recused himself.

174.     Justice Freeman appeared as a witness on behalf of the Chief Justice at trial.  He testified about a number of factual issues in dispute, stating that Thomas was not biased against Meg Gorecki and that Thomas originally recommended a six-month suspension for the Kane County State's Attorney when the Supreme Court held its first impression vote.  TR 1359:18-20. Justice Freeman was the only witness to state that he had heard that Chief Justice Thomas was on a short list for a United States Supreme Court nomination.  TR 1370:15-21.  He also defended Thomas as a person of the "highest moral character" and asserted that there was "no truth" to the editorial columns in the Chronicle.  TR 1363:7-8; 1381:2.

175.     According to the Illinois Code of Judicial Conduct, a judge "shall disqualify" himself in a proceeding "in which the judge's impartiality might reasonably be questioned," including when the judge has "personal knowledge of disputed evidentiary facts," where the judge is, to the judge's knowledge, "likely to be a material witness in the proceeding," or where the judge has "more than de minimis interest that could be substantially affected by the proceeding."  Ill. Sup. Ct. R. 63(C)(1)(d).  The record does not indicate why Justice Freeman did not recuse himself from the interlocutory appeal in February 2006 as did the other non-party Justices, but by May 2007 Justice Freeman had already been a material witness in the state defamation action and had testified about disputed evidentiary facts, as had three other current members of the Supreme Court.  His partiality is well-established.  He therefore should have disqualified himself from taking any action in this case, including signing the May 4, 2007 order appointing judges under his supervision to decide the appeal of Chief Justice Thomas's defamation judgment.

176.     The Supreme Court therefore had no quorum of four Justices to issue its third

order reassigning the appeal in this case to judges from the First Appellate District. The mass recusal of members of the Court on February 8, 2006 supports this conclusion. Four of the seven members of the Supreme Court had disqualified themselves at that time, including Chief Justice Thomas and Justices Fitzgerald, Kilbride, and Garman. Clearly, they apprehended then, as they must now, that disqualification was appropriate.

177.    On May 29, 2007, Justice Greiman of the First Appellate District, who sits on the Appellate Court at the pleasure of the Supreme Court, named Justices Hoffman, Cahill, and O'Brien to hear the appeal of the defamation judgment. See Ex. 43. The appellate judges who Justice Greiman hand-picked to decide the interlocutory appeal are thus the same judges he assigned to the appeal of the trial judgment. As First Appellate District Justices, Justices Hoffman, Cahill, and O'Brien are directly supervised by Chief Justice Thomas and by Supreme Court Justices Freeman, Fitzgerald, and Burke – who collectively make up a majority of the Illinois Supreme Court.

178.    On June 11, 2007, just weeks after the Illinois Supreme Court assigned judicial personnel to hear the appeal of the Chief Justice's judgment, the non-party Justices entered an appearance in the appeal. See Ex. 44. They again placed themselves in the caption of the case.

179.    Under the scheduling order of the Appellate Court, the Chronicle and Page are required to file their opening brief in the appeal on September 10, 2007.

180.    Since the filing of Chief Justice Thomas's lawsuit, the judicial officers who are defendants in the federal civil rights action have engaged in conduct constituting state action under 42 U.S.C. § 1983 that includes but is not limited to the following acts: a) denying the Chronicle and Page impartial trial and appellate forums; b) eliminating the court of last resort in the state judicial system for the Chronicle and Page and thus creating an unprecedented judicial

interregnum in which neither an Application for a Certificate of Importance nor a Petition for Leave to Appeal can be granted; c) reassigning the Chief Justice's lawsuit to hand-picked judges within the Illinois judiciary without providing an explanation or an opportunity for the Chronicle and Page to be heard; d) denying the Chronicle and Page a forum with judges from the judicial circuit and appellate district in which they at all relevant times resided; e) creating an absolute judicial deliberation privilege and applying the privilege to block the discovery and admission into the trial record of evidence relevant to the truth of the facts in the opinion columns and the defense of the state defamation case; f) protecting the non-party Justices by requiring that their depositions be submitted on written questions; g) reassigning the state defamation case in violation of the Code of Judicial Conduct and federal due process and equal protection guarantees, and h) issuing a Supreme Court mandate returning the case to the Circuit Court for trial when no quorum existed in violation of the Code of Judicial Conduct and federal due process and equal protection guarantees.

## COUNT I

### Claim Under 42 U.S.C. § 1983 For Denial Of Impartial Judicial Forum In Violation Of The Fifth And Fourteenth Amendments

181.    Plaintiffs re-allege the allegations of Paragraphs 1-180 which are incorporated herein by reference.

182.    In connection with Chief Justice Thomas's defamation lawsuit, the defendants, acting under color of state law, have deprived the Chronicle and Page of their due process and equal protection rights under the Fifth and Fourteenth Amendments of the United States Constitution to an impartial tribunal in both the trial and appellate courts of Illinois in violation of the Civil Rights Act of 1871, 17 Stat. 13, as amended 42 U.S.C. § 1983.

48

183.     As the appeal of the Chief Justice's judgment moves forward, the <u>Chronicle</u> and Page will continue to be deprived of their due process and equal protection rights under the Fifth and Fourteenth Amendments.  They have no remedy at law.  Therefore, until the conduct of the defendants is declared unlawful, the <u>Chronicle</u> and Page will be subject to further deprivation of their rights to an impartial tribunal in both the trial and appellate courts of Illinois in violation of 42 U.S.C. § 1983.

184.     The <u>Chronicle</u> and Page have been and will continue to be irreparably harmed due to the deprivation of their due process and equal protection rights under the Fifth and Fourteenth Amendments to an impartial tribunal in both the trial and appellate courts of Illinois in violation of 42 U.S.C. § 1983.

## COUNT II

### <u>Claim Under 42 U.S.C. § 1983 For Denial Of Independent Appellate Review In Violation Of The First And Fourteenth Amendments</u>

185.     Plaintiffs re-allege the allegations of Paragraphs 1-184 which are incorporated herein by reference.

186.     In <u>Bose</u>, the United States Supreme Court created a unique constitutional role for appellate courts in public-official defamation cases.  Under <u>Bose</u>, appellate courts must make "an independent examination of the entire record" to determine whether a plaintiff has met all constitutional burdens.  <u>Bose</u>, 466 U.S. at 499.  The <u>Bose</u> rules reflect a "deeply held conviction that judges . . . must exercise such review in order to preserve the precious liberties established and ordained by the Constitution."  <u>Id.</u> at 510-11.  The "requirement of independent appellate review" is "a rule of federal constitutional law."  <u>Id.</u> at 510.

187.     In connection with Chief Justice Thomas's defamation lawsuit, the defendants,

acting under color of state law, will deprive the <u>Chronicle</u> and Page of their rights under the First and Fourteenth Amendments of the United States Constitution to independent appellate review in violation of 42 U.S.C. § 1983. A searching, <u>de</u> <u>novo</u> appellate review in this case will require appellate judges to assess critically and with complete independence the allegations of injury claimed by the Chief Justice to his reputation, mental well-being, and his future earning potential; the evidence of truth and falsity relating to the facts in the <u>Chronicle</u> opinion columns; the prejudicial effect of the judicial deliberation privilege; and even the credibility of the testimony given by the Chief Justice and the non-party Justices, among other issues.

188.    Illinois appellate judges reviewing a trial record consisting largely of testimony from their judicial supervisors on the Illinois Supreme Court will be unable to conduct the independent appellate review to which the <u>Chronicle</u> and Page are entitled under <u>Bose</u> and the United States Constitution.

189.    As the appeal of the Chief Justice's judgment moves forward, the <u>Chronicle</u> and Page will be deprived of their First and Fourteenth Amendment rights to <u>de</u> <u>novo</u> appellate pursuant to <u>Bose</u>. They have no remedy at law. Therefore, until the conduct of the defendants is declared unlawful, the <u>Chronicle</u> and Page will be subject to further deprivation of their First and Fourteenth Amendment rights under <u>Bose</u> in violation of 42 U.S.C. § 1983.

190.    The <u>Chronicle</u> and Page have been and will be irreparably harmed due to the deprivation of their First and Fourteenth Amendment rights under <u>Bose</u> to independent appellate review in violation of 42 U.S.C. § 1983.

**COUNT III**

**<u>Claim Under 42 U.S.C. § 1983 For Denial Of Appellate Rights And Access To Courts In Violation Of The First, Fifth And Fourteenth Amendments</u>**

191.    Plaintiffs re-allege the allegations of Paragraphs 1-190 which are incorporated

herein by reference.

192.    When a state establishes a system of appellate review, the state must treat all persons equally under the law and provide due process to every party who seeks to exercise its appellate rights.

193.    Illinois law provides litigants with the right to file a Petition for Leave to Appeal to the Illinois Supreme Court to request review of a judgment.  See Ill. Sup. Ct. R. 315.  While the Illinois Supreme Court grants Petitions for Leave to Appeal at its discretion, when no quorum exists at the Illinois Supreme Court to hear the appeal, the right to file a Petition for Leave to Appeal is effectively eradicated.

194.    Illinois law also provides litigants with the right to file an Application for a Certificate of Importance from the Illinois Appellate Court.  See Ill. Sup. Ct. R. 316.  If a Certificate of Importance is granted, appeal to the Illinois Supreme Court is by right.  While the Illinois Appellate Court grants Certificates of Importance at its discretion, when no quorum exists at the Illinois Supreme Court to hear the appeal, the right to file an Application for a Certificate of Importance is effectively eradicated.

195.    Illinois law has no mechanism to provide for the temporary replacement of Supreme Court Justices when the Illinois Supreme Court has no quorum of four under Art. VI § 3 of the Illinois Constitution due to the disqualification of individual Justices.

196.    The Illinois Supreme Court disqualified itself from the interlocutory appeal in the state defamation case in February 2006.  Its action denied the Chronicle and Page their rights to have a Petition for Leave to Appeal and an Application for a Certificate of Importance decided on the merits.

197.    In connection with Chief Justice Thomas's defamation lawsuit, the defendants, acting under color of state law, have deprived the Chronicle and Page of their due process and equal protection rights to full and equal participation in the appellate process under the Fifth and Fourteenth Amendments, as well as their right of access to the courts under the First, Fifth, and Fourteenth Amendments, in violation of 42 U.S.C. § 1983.

198.    Based on its past actions, the Illinois Supreme Court can be expected to disqualify itself again on appeal of Chief Justice Thomas's defamation judgment.

199.    As the appeal of the Chief Justice's judgment moves forward, the Chronicle and Page will be deprived of their Fifth and Fourteenth Amendment rights to full and equal participation in the appellate process and their First, Fifth, and Fourteenth Amendment rights of access to the courts.  They have no remedy at law.  Therefore, until the conduct of the defendants is declared unlawful, the Chronicle and Page will be subject to further deprivation of their First, Fifth, and Fourteenth Amendment rights in violation of 42 U.S.C. § 1983.

200.    The Chronicle and Page have been and will be irreparably harmed due to the deprivation of their rights under the First, Fifth, and Fourteenth Amendments to full and equal participation in the appellate process and to access to the courts in violation of 42 U.S.C. § 1983.

## COUNT IV

### Claim Under 42 U.S.C. § 1983 For Denial Of Constitutional Right To Prove Truth In Violation Of The First And Fourteenth Amendments

201.    Plaintiffs re-allege the allegations of Paragraphs 1-200 which are incorporated herein by reference.

202.    Defamation defendants have a constitutional right to raise and present evidence of truth as a defense.  See Hepps, 475 U.S. at 776-77; ILL. CONST. Art. I, § 4 ("In trials for libel,

52

both civil and criminal, the truth, when published with good motives and for justifiable ends, shall be a sufficient defense.").

203.     Chief Justice Thomas sued over allegedly defamatory publications relating to his official conduct within a judicial proceeding.  The <u>Chronicle</u> and Page were forbidden by the judicial deliberation privilege established in the state defamation action by the defendant judges, however, from seeking documentary information and testimony from the Chief Justice's colleagues, thereby preventing the newspaper and its columnist from establishing the constitutional defense of substantial truth.  <u>See</u> <u>Masson</u>, 501 U.S. at 516-17.

204.     In connection with Chief Justice Thomas's defamation lawsuit, the defendants, acting under color of state law, have deprived the <u>Chronicle</u> and Page of their rights under the First and Fourteenth Amendments of the United States Constitution to prove substantial truth, to express opinions about the judicial process, and to defend a common-law defamation and false light claim, in violation of 42 U.S.C. § 1983.

205.     As the appeal of the Chief Justice's judgment moves forward, the <u>Chronicle</u> and Page will continue to be deprived of their rights under the First and Fourteenth Amendments to prove substantial truth, to express opinions about the judicial process, and to defend a common-law defamation and false light claim.  They have no remedy at law.  Therefore, until the conduct of the defendants is declared unlawful, the <u>Chronicle</u> and Page will be subject to further deprivation of their rights under the First and Fourteenth Amendments in violation of 42 U.S.C. § 1983.

206.     The <u>Chronicle</u> and Page have been and will be irreparably harmed due to the deprivation of their rights under the First and Fourteenth Amendments to prove substantial truth,

to express opinions about the judicial process, and to defend a common-law defamation and false light claim in violation of 42 U.S.C. § 1983.

## COUNT V

### Claim Under 42 U.S.C. § 1983 For Denial Of Due Process And Equal Protection In Judicial Reassignment In Violation Of The Fifth And Fourteenth Amendments

207.    Plaintiffs re-allege the allegations of Paragraphs 1-206 which are incorporated herein by reference.

208.    When a state establishes a system of trial circuits and appellate districts and holds elections for those seats, residents of those trial circuits and appellate districts sued in their counties of residence have a presumptive right to local presiding judges unless one party seeks recusal and the matter is fairly litigated in open proceedings.  See ILL. CONST. Art. VI, § 6.

209.    In the unusual circumstance where a lawsuit is reassigned to different judicial personnel in a different trial circuit or appellate district within the state, the state must provide due process and equal protection in the transfer of the case.

210.    The orders the Illinois Supreme Court entered on April 15, 2004, April 15, 2005, and May 4, 2007 in the Chief Justice's defamation case violated Ill. Sup. Ct. R. 63(C) and the quorum requirements of Art. VI, § 3 of the Illinois Constitution.  These orders, which reassigned the matter to judges in the district with the greatest concentration of judicial power in the state, were entered by Justices on the Illinois Supreme Court with a direct and substantial interest in the case and without providing notice and an opportunity to be heard to the Chronicle and Page.

211.    In connection with Chief Justice Thomas's defamation lawsuit, the defendants, acting under color of state law, have deprived the Chronicle and Page of their due process and equal protection rights in the judicial reassignment process under the First and Fourteenth

Amendments of the United States Constitution in violation of 42 U.S.C. § 1983.

212.    As the appeal of the Chief Justice's judgment moves forward, the <u>Chronicle</u> and Page will continue to be deprived of their due process and equal protection rights in the judicial reassignment process under the Fifth and Fourteenth Amendments.  They have no remedy at law. Therefore, until the conduct of the defendants is declared unlawful, the <u>Chronicle</u> and Page will be subject to further deprivation of their rights in the judicial reassignment process in violation of 42 U.S.C. § 1983.

213.    The <u>Chronicle</u> and Page have been and will continue to be irreparably harmed due to the deprivation of their Fifth and Fourteenth Amendment rights in the judicial reassignment process in violation of 42 U.S.C. § 1983.

<b>PRAYER FOR RELIEF</b>

WHEREFORE, Plaintiffs respectfully request that this Court: a) enter a declaratory judgment that Chief Justice Thomas's defamation judgment is repugnant to the First, Fifth, and Fourteenth Amendments of the United States Constitution and cannot be enforced; b) enter a declaratory judgment that any future proceedings or prosecution of the state defamation case in the court system of Illinois while Chief Justice Thomas and the non-party Justices remain in office will violate the First, Fifth, and Fourteenth Amendments of the United States Constitution; c) enter a declaratory judgment that judicial reassignment orders entered by the Illinois Supreme Court in the state defamation case violate the Fifth and Fourteenth Amendments of the United States Constitution; d) if any of this Court's declaratory decrees are violated, permanently enjoin the judiciary of Illinois from taking any further action in the state defamation case (including reassignment of the case within the state court system, consideration of the appeal, or enforcement of the judgment) until Chief Justice Thomas and all the non-party Justices are no

longer serving as Illinois state court judges; e) award reasonable costs and attorney's fees

pursuant to 42 U.S.C. § 1988; and f) provide such other relief as the Court deems just and proper.

Respectfully submitted,

**SHAW SUBURBAN MEDIA GROUP, INC.
AND BILL PAGE**

By: ___/s/ Steven P. Mandell_____
       One of the Attorneys for Plaintiffs

Steven P. Mandell
Stephen J. Rosenfeld
Steven L. Baron
Brendan J. Healey
MANDELL MENKES LLC
333 West Wacker Drive, Suite 300
Chicago, Illinois 60606
312-251-1000

Bruce W. Sanford (admitted pro hac vice)
Lee T. Ellis, Jr. (admitted pro hac vice)
Bruce D. Brown (admitted pro hac vice)
Laurie A. Babinski (admitted pro hac vice)
BAKER & HOSTETLER LLP
1050 Connecticut Ave. NW, Suite 1100
Washington, D.C. 20036
202-861-1500

56

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned, an attorney, hereby certifies that I caused this ***AMENDED COMPLAINT*** to be served on:

> Michael A. Scodro
> Ronald A. Rascia
> Office of the Attorney General
> State of Illinois
> 100 West Randolph Street, 13th Floor
> Chicago, Illinois  60601

by ECF as indicated on this July 26, 2007.

_/s/ Steven P. Mandell_____